KATHLEEN ANN KEOUGH, J.:
*1016 {¶1} Plaintiff-appellant/cross-appellee, Nehemiah T. Moore, appeals from the trial court's decision reducing the jury's award of punitive damages from $ 25,000 to $ 0. Defendant-appellee/cross-appellant, William T. Schill, appeals from the trial court's decision denying his motion for summary judgment. For the reasons that follow, we reverse the trial court's decision reducing the jury's award of punitive damages, but affirm the trial court's decision denying Schill's motion for summary judgment.
{¶2} In 2013, Moore filed an amended complaint against Schill and others, asserting claims of piercing the corporate veil, unjust enrichment, misrepresentation, vicarious liability, and conspiracy to commit fraud. According to the amended complaint and relevant to this appeal, Moore alleged that Schill committed fraud regarding a real estate transaction and converted from an escrow account funds belonging to Moore. The complaint alleged that in March 2008, Schill became aware of purported real estate transactions involving Homecomings Financial, L.L.C., as seller, and Centurian Asset Partners, Inc., as purchaser, and GMAC, as the intermediary bank that would be financing the deal. According to the complaint, Schill is an attorney and an officer of PMCC, Ltd., and owned Ameritrust Home Title Solutions, Ltd. The real estate transaction involved 32 properties and was referred to as "REO 106."
{¶3} The complaint alleged that Schill attempted to capitalize on the REO 106 deal by soliciting the aid of Joel Allen and Susan Finnigan, officers of PMCC, Ltd., and Siam Joseph, a Florida attorney.
{¶4} The complaint alleged that on July 1, 2008, Schill, acting as president of Ameritrust, sent a letter to Joseph to assure him that if he invested in the REO 106 deal, he would make a substantial return on his investment, but if the transaction did not close, the funds would be returned. Joseph, relying on the assurances made by Schill, informed Moore that investing in REO 106 was a good opportunity. Based on these assurances, Moore wired $ 239,000 to Joseph's trust account; the funds were ultimately wired into an escrow account at Ameritrust. On July 3, 2008, Schill directed the disbursement officer at Ameritrust to wire $ 39,000 into a PMCC account, that was owned by Schill and Finnigan. On July 21 and 31, 2008, Schill again directed the disbursement officer at Ameritrust to wire $ 25,000 and $ 5,000, respectively, to a PMCC account.
{¶5} The REO 106 deal did not close and it was ultimately revealed that the deal was fraudulent. Schill did not return the initial-invested funds to Joseph. Instead, Moore alleged that Schill directed the disbursement officer at Ameritrust to issue various wire transfers to purchase real property in Rocky River that was titled to PMCC. After it was discovered that the REO 106 deal was based on fraud, and Allen began questioning the various transactions and representations made, Schill transferred the assets of PMCC to Allen. The complaint alleged that when the Rocky River property was sold to a third-party, Schill, Allen, and Joseph received over $ 77,000. At no time did the parties notify Moore that the REO 106 deal fell through, or return the $ 239,000 that Moore had wired to Joseph.
*1017 {¶6} Schill denied the allegations, contending that any monies paid out of the escrow account were for common-practice due diligence title work that is typically performed in real estate transactions. Additionally, Schill maintained that he did not have a contractual or agency relationship with Moore.
{¶7} In 2014, the trial court summarily denied Schill's motion for summary judgment. In 2015, Schill filed for Chapter 7 bankruptcy, and through those bankruptcy proceedings, all claims except for the misrepresentation claim were discharged.
{¶8} The misrepresentation claim proceeded to a jury trial. The jury found in favor of Moore and awarded him compensatory damages in the amount of $ 189,000. The jury specifically found that (1) Schill made a material representation of fact to Moore directly or through his agent; (2) Schill knew when he made the representation that it was false or with such reckless disregard that knowledge could be inferred; (3) Schill meant for Moore or his agent to rely on the false statement; (4) a preponderance of the evidence showed that Moore or his agent justifiably relied on the false statement; and (5) Moore suffered a pecuniary loss.
{¶9} The jury apportioned damages in the following manner: "Siam Joseph - 10%; William Schill - 70%; Nehemiah Moore - 5%; Joel Allen - 5%; Ameritrust Home Title Solutions (not attributed to William Schill) - 5%; and PMCC, Ltd. - 5%." Accordingly, $ 132,300 was apportioned against Schill. Because the jury awarded Moore compensatory damages, the determination of punitive damages and attorney fees were subsequently submitted to the jury.
{¶10} During the punitive damages phase of the trial, the jury was instructed that it could consider all the evidence submitted thus far. Although Moore did not submit any additional evidence, Schill set forth evidence regarding his "net worth" by introducing testimony and evidence regarding his bankruptcy petition.
{¶11} The jury found that Moore proved by clear and convincing evidence that Schill acted with egregious fraud, and awarded Moore $ 25,000 in punitive damages. Schill moved for a reduction of the punitive damages award pursuant to R.C. 2315.21(D)(1), which places a cap or limitation on punitive damages awarded against an individual. Following briefing, the trial court agreed with Schill, and reduced the punitive damages award to $ 0.
{¶12} Moore now appeals the trial court's decision reducing the punitive damages award, and Schill cross-appeals, challenging the denial of his motion for summary judgment. Neither party challenges the jury's verdict on liability and compensatory damages, or the jury's decision to award punitive damages.
I. Appeal
{¶13} In his sole assignment of error, Moore contends that the trial court's decision to reduce the punitive damages award from $ 25,000 to $ 0 was contrary to law and an abuse of discretion.
{¶14} Pursuant to R.C. 2315.21(D)(1), the trier of fact shall determine the liability of any defendant for punitive or exemplary damages and the amount of those damages. Subsection (D)(2) places a cap or limitation on the award of punitive damages, and relevant to this case, subsection (b) provides that if the defendant is an individual, "the court shall not enter judgment for punitive * * * damages in excess of the lesser of two times the amount of compensatory damages * * * or ten percent of the * * * individual's net worth when the tort was committed up to a maximum of three hundred fifty thousand dollars * * *."
*1018 {¶15} In this case, the jury awarded Moore punitive damages in the amount of $ 25,000. Following trial and after hearing arguments on reduction, the trial court suggested briefing by the parties regarding whether the award of punitive damages should be reduced "since there isn't proof of [Schill's] net worth in either 2008 or now other than negative net worth." (Tr. 505.)
{¶16} Schill filed a motion requesting that the trial court reduce the punitive damage amount to $ 0 based on the evidence that was presented during the punitive damages phase of trial. According to Schill, the testimony of his bankruptcy and tax attorney, Robert Fedor, and his 2015 bankruptcy petition proved that he had a negative net worth. Moore rebutted Schill's motion, asserting that no evidence was presented depicting Schill's net worth in 2008 - when the tort was committed. Moore argued that Schill should therefore not be entitled to any punitive damages reduction. In response, Schill attached to his reply brief his own affidavit stating that according to his recollection, he had a negative net worth in July 2008. Additionally, Schill attached "Schedule F" from his 2015 bankruptcy petition that showed certain claims from unsecured creditors existed prior to 2008.
{¶17} The trial court issued a written opinion in which it properly found that Schill's net worth is to be determined as of when the tort was committed. However, the court found that Schill "presented clear and convincing evidence that his net worth was negative at the time he committed the subject tort." A review of the record does not support the trial court's conclusion.
{¶18} A plaintiff has no burden to provide evidence of the defendant's financial situation in order to recover punitive damages. Wagner v. McDaniels , 9 Ohio St.3d 184, 186-187, 459 N.E.2d 561 (1984). The party seeking reduction to avoid punitive damages bears the burden of showing that his financial situation was a pertinent factor in a lesser punitive damages award, and accordingly, is responsible for placing such evidence in the record. Bigler v. Personal Serv. Ins. Co. , 7th Dist. Belmont No. 12 BE 10, 2014-Ohio-1467, 2014 WL 1384572, ¶ 165, citing Wagner at id.
{¶19} During the punitive damages phase, Attorney Fedor testified about Schill's assets and liabilities. Specifically, Fedor testified that Schill filed for Chapter 7 bankruptcy in 2015, which he classified as a "liquidation bankruptcy." According to Fedor, based on the bankruptcy petition, Schill had a negative net worth - his liabilities exceeded "any assets which could go to his creditors." Additionally, Fedor testified that Schill had about $ 200,000 in tax liabilities. However, Fedor acknowledged that the income amount stated in the bankruptcy petition only reflected Schill's income and assets at the time the petition was filed - September 2015.
{¶20} We initially note that a Chapter 7 bankruptcy allows for certain exemptions not subject to bankruptcy proceedings. See Kearney v. Campbell , 9th Dist. Summit No. 27495, 2016-Ohio-1332, 2016 WL 1243598, ¶ 15, citing In re Robinson , 292 B.R. 599, 606 (Bankr.S.D. 2003) (the bankruptcy code affords debtors the right to exempt certain property from the bankruptcy estate; Schedule C-Property Claimed as Exempt); 11 U.S.C. 522. Accordingly, a Chapter 7 bankruptcy proceeding may not be an accurate or fair representation of a person's "net worth" when determining punitive damages caps, especially when the petition is filed years after the tort was committed.
*1019 {¶21} Morever, the term "net worth" is not defined in R.C. 2315.21, and no guidance is given to courts regarding how to determine the net worth of a party when considering punitive damages limitations. See Faieta v. World Harvest Church , 147 Ohio Misc.2d 51, 89, 2008-Ohio-3140, 891 N.E.2d 370 (C.P.) (noting the lack of definition and guidance in determining net worth at the time the tort was committed). However, the plain and customary meaning of "net worth" is the "excess of value of assets over liabilities." Merriam-Webster , https://www.merriam-webster.com/dictionary/net worth (accessed Dec. 17, 2018).
{¶22} In this case, the record does not support the trial court's decision that Schill had a negative net worth in 2008 when the tort was committed. No evidence was presented depicting Schill's net worth in 2008 except for a schedule of a few preexisting unsecured creditors listed in his bankruptcy petition filed in 2015, and a self-serving affidavit that was attached to Schill's reply brief that was filed only after Moore challenged the lack of evidence submitted. Specifically, Schill did not present any evidence of his assets or income as it existed in 2008. See, e.g. , Feita (party seeking reduction submitted tax returns and bank statements showing assets at the time the tort was committed). Without evidence of Schill's income or assets in 2008, no determination could be made regarding his "net worth."
{¶23} Accordingly, the trial court abused its discretion in reducing the punitive damages award from $ 25,000 to $ 0. The trial court's decision is reversed and the jury's punitive damages award of $ 25,000 is reinstated.
{¶24} Moore's assignment of error is sustained.
II. Cross-Appeal - Summary Judgment
{¶25} Prior to addressing Schill's cross-assignment of error, we consider Moore's argument that Schill's cross-appeal was not timely filed and should not be considered.
{¶26} According to App.R. 4(B)(1), if a timely notice of appeal is filed, "another party may file a notice of appeal within the appeal time period otherwise prescribed by this rule or within ten days of the filing of the first notice of appeal." However, App.R. 4(B)(2) allows for tolling of the time to appeal from the final order with the filing of certain timely and appropriate post-judgment motions. Specific to this case, App.R. 4(B)(2)(b) allows for the appeal time to be tolled with a timely filed motion for new trial under Civ.R. 59. After the trial court rules on the motion, the appeal time from the final order "begins to run for all parties when the trial court enters an order resolving the last of these post-judgment motions." App.R. 4(B)(2).
{¶27} The trial court entered its final appealable order on April 10, 2018. The following day on April 11, Moore filed his notice of appeal. Subsequently, Schill timely filed a motion for new trial pursuant to Civ.R. 59. This court remanded the case back to the trial court for a ruling on Schill's motion. Approximately 28 days after the trial court denied Schill's motion for new trial, Schill filed his cross-appeal. Accordingly, pursuant to the exception in App.R. 4(B)(2), Schill's cross-appeal was timely because it was filed within 30 days of the trial court's denial of his motion for new trial.
{¶28} In his cross-appeal, Schill contends that the trial court erred in denying his motion for summary judgment.
{¶29} An appellate court reviews a trial court's decision on a motion for *1020 summary judgment de novo. Grafton v. Ohio Edison Co. , 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Summary judgment is appropriate when, construing the evidence most strongly in favor of the nonmoving party, (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can only reach a conclusion that is adverse to the nonmoving party. Zivich v. Mentor Soccer Club, Inc. , 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201 (1998).
{¶30} The party moving for summary judgment bears the burden of demonstrating that no material issues of fact exist for trial. Dresher v. Burt , 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). The moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claims. Id. After the moving party has satisfied this initial burden, the nonmoving party has a reciprocal duty to set forth specific facts by the means listed in Civ.R. 56(C) showing that there is a genuine issue of material fact. Id.
{¶31} In this case, Schill moved for summary judgment on Moore's claims for conversion, unjust enrichment, and misrepresentation,[1] contending that he was entitled to judgment as a matter of law.
{¶32} Schill contended in his renewed motion for summary judgment that no relationship, contractual or otherwise, existed between him and Moore, and therefore, Moore's misrepresentation claim failed as a matter of law. In response, Moore contended that a relationship between him and Schill existed because Joseph was acting as Moore's agent when Joseph wired Moore's funds to Ameritrust for the real estate deal. Additionally, Moore maintained that Schill held himself out to be the President of Ameritrust Home Title Solutions, and acknowledged in a letter (1) the receipt of the funds, (2) the purpose of the funds, and (3) that if the deal did not close, the funds would be returned.
{¶33} A fraudulent misrepresentation made to an agent with knowledge that the agent would relay that misrepresentation to the principal is just as actionable as making the misrepresentation to the principal himself. Brevoort v. Internatl. Fin. Resources, Inc. , 10th Dist. Franklin No. 91AP-1364, 1992 WL 246004, *2 (Sept. 24, 1992), citing Restatement of Law 2d, Agency, Section 315, at 56 (1958) ; 3 American Jurisprudence 2d, Agency, Section 298, at 802 (1986).
{¶34} In this case, contradictory evidence and statements of fact were presented that created genuine issues of material fact. Schill argued in his motion that he "did not have control or authority to direct wire transfers from any Ameritrust account," yet documentary evidence at the time of summary judgment showed that Schill transferred funds from the Ameritrust account to the PMCC account. Schill also argued on summary judgment that once the initial real estate deal fell through, he was instructed to use the funds for a different real estate transaction involving real property in Rocky River. However, whether it was disclosed that Schill may have had a pecuniary or financial interest in the real estate remained a question of fact. Accordingly, Schill failed to withstand his burden of demonstrating *1021 that no genuine issue of material fact existed on Moore's misrepresentation claim.
{¶35} The trial court also did not err in denying Schill's motion for summary judgment on his conversion and unjust enrichment claims. Conversion is the wrongful control or exercise of dominion over property belonging to another inconsistent with or in denial of the rights of the owner. Tabar v. Charlie's Towing Serv. , 97 Ohio App.3d 423, 427, 646 N.E.2d 1132 (8th Dist.1994), citing Bench Billboard Co. v. Columbus , 63 Ohio App.3d 421, 428, 579 N.E.2d 240 (10th Dist.1989) ; Ohio Tel. Equip. & Sales, Inc. v. Hadler Realty Co. , 24 Ohio App.3d 91, 493 N.E.2d 289 (10th Dist.1985). In order to prove the conversion of property, the owner must demonstrate (1) he or she demanded the return of the property from the possessor after the possessor exerted dominion or control over the property, and (2) that the possessor refused to deliver the property to its rightful owner. Tabar at 427-428, 646 N.E.2d 1132.
{¶36} To prove an unjust enrichment claim, the plaintiff must prove that he conferred a benefit on the defendant, the defendant had knowledge of that benefit, and the defendant's retention of that benefit would be unjust under the circumstances. Hambleton v. R. G. Barry Corp. , 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1994).
{¶37} In addition to arguing that no relationship existed between him and Moore, Schill contends that Moore's claims for conversion and unjust enrichment also fails because Moore was unable to identify that the wired money was actually his, and because neither Moore nor Joseph asked that the funds be returned. However, documentary evidence was presented that the $ 239,000 transfer originated with Moore, but was subsequently transferred from Joseph's wife to the Ameritrust account. Additionally, Schill's own letter when the funds were transferred clearly indicated that if the real estate deal did not close, the funds would be returned. The letter did not disclose that Schill would pay himself out of the funds for "due diligence work." Finally, at the time of summary judgment, no evidence was presented that either Moore or Joseph authorized Schill to compensate himself out of these funds.
{¶38} Accordingly, genuine issues of material fact existed that would cause reasonable minds to reach different conclusions as to whether Schill was liable to Moore on his claims for fraud, conversion, and unjust enrichment. The trial court did not err in denying Schill's motion for summary judgment, and Schill's cross-assignment of error is therefore overruled.
{¶39} Judgment affirmed in part; reversed in part; and remanded for the trial court to enter an order reinstating punitive damages in the amount of $ 25,000 as awarded by the jury.
EILEEN T. GALLAGHER, P.J., and PATRICIA ANN BLACKMON, J., CONCUR

Moore's causes of action for conversion and unjust enrichment were subsequently disposed of through Schill's bankruptcy proceeding. The parties do not dispute this fact; the only remaining cause submitted to the jury was Moore's claim for misrepresentation.