[Cite as *Masterson v. Brody*, 2022-Ohio-3430.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

|  |  |  |
|---|---|---|
| MARK MASTERSON, ADMINISTRATOR, ET AL., | : | |
| | : | |
| Plaintiffs-Appellees/ Cross-Appellants, | : | |
| | | No. 111048 |
| v. | : | |
| ZACHARY BRODY, ET AL., | : | |
| Defendants. | : | |
| [Appeal by Clifton Knoth, | : | |
| Defendant-Appellant/ Cross-Appellee] | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 29, 2022

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-16-857804

*Appearances:*

Law Office of John T. Forristal and John T. Forristal, *for appellees*.

James L. Deese, *for appellant* Clifton Knoth.

MICHELLE J. SHEEHAN, J.:

{¶ 1} This appeal involves allegations of errors in a civil trial for wrongful death claims stemming from a prior criminal case. The primary issue presented is whether defendant-appellant Clifton Knoth owed a duty of care to the deceased. During Labor Day weekend in 2011, a group of Bowling Green State University graduates and former fraternity brothers rented two cabins owned by the Island Club in Put-in-Bay. The group included Zachary Brody, Cameron Parris, and appellant Knoth. Philip Masterson (referred to as "Masterson" hereafter), who was not part of the group, showed up outside one of the cabins in the early morning hours of September 5, 2011, and was invited by Knoth to drink with some members of the group. Masterson did not come home later that day. His body was discovered the following day by his family, severely beaten, in the woods behind the cabins. Brody was eventually convicted of involuntary manslaughter in Masterson's death. Parris was convicted of falsification. Knoth was not charged.

{¶ 2} In 2016, Mark Masterson, Phil Masterson's brother and the administrator of his estate ("plaintiff estate" or "plaintiff" hereafter), filed a wrongful death lawsuit against Brody, Parris, Knoth, several other members of their group, and certain corporate entities related to the Island Club. The trial court granted summary judgment in favor of the corporate entities. The claims against Brody, Parris, and Knoth were tried to a jury.

{¶ 3} In 2021, following an extensive trial, the jury awarded substantial compensatory and punitive damages to plaintiff against Brody, Parris, and Knoth.

The trial court subsequently reduced the punitive damages assessed against Knoth to zero upon a post-trial motion. Brody and Knoth appealed separately from the judgment in 8th Dist. Cuyahoga Nos. 111043 and 111048.[1] Plaintiff filed a cross-appeal in the instant appeal.

{¶ 4} In Appeal No. 111048, Knoth raises the following assignments of error for our review:

> I. The trial court committed prejudicial error when it denied Appellant's Motions for Directed Verdict and for Judgment Notwithstanding the Verdict with respect to plaintiff's claim of ordinary negligence.
>
> II. The trial court committed prejudicial error when it denied Appellant's Motion for Summary Judgment, for Directed Verdict and for Judgment Notwithstanding the Verdict with respect to plaintiff's claim for violation of R.C. 2305.45.
>
> III. The trial court committed prejudicial error when it (1) commenced the punitive damage stage of the trial before completion of the compensatory damages stage and (2) denied Knoth's Motion for New Trial insofar as it raised this issue.

{¶ 5} Plaintiff estate raises the following assignment of error in its cross-appeal:

> I. The trial court erred when it granted appellant Knoth's motion to reduce jury verdicts and/or for remitter.

---

[1] Plaintiff filed an appeal, 8th Dist. Cuyahoga No. 111035, challenging the summary judgment granted in favor of the corporate defendants. This court sua sponte made Appeal Nos. 111035, 111043, and 111048 companion cases.

**{¶ 6}** After a thorough review of the record and applicable law, we find no merit to Knoth's appeal or plaintiff's cross-appeal and, therefore, affirm the trial court's judgment.

**Events Leading to the Victim's Death**

**{¶ 7}** The Island Club is located in the village of Put-in-Bay, on South Bass Island. The Island Club consists of dozens of cabins, many of which are rented to short-term visitors to the island. Brody and his friends rented two cabins, cabin 90 and 92, to spend the Labor Day weekend drinking and partying on the island. A member of the group, Matthew Brotzki, signed the rental agreement for cabin 90, where Brody and most of the codefendants stayed; Knoth stayed in cabin 92, but was drinking on the deck of cabin 90 before Masterson showed up around 3 a.m. on Monday morning in the vicinity of cabin 90.

**{¶ 8}** The only witnesses to the events following Masterson's arrival at cabin 90, which ultimately resulted in his death, were the defendants. The defendants were evasive and uncooperative when testifying on cross-examination in the instant wrongful death trial. As a result, many details of the events were not able to be ascertained.

**{¶ 9}** It is unclear how Masterson, who stayed at a different part of the island, ended up at cabin 90. A taxi driver told the police that he picked up Masterson and another individual from a bar and dropped them off at cabin 67 around 2:30 a.m. Masterson appeared highly intoxicated. By all accounts, Masterson arrived in the area of cabin 90 on a golf cart with an unidentified man

{¶ 10} Brody was asleep at the time Masterson arrived, but Parris and Knoth were among those still awake and drinking on the deck. Knoth acknowledged that he invited Masterson and his companion to join them and drink. Around 5 a.m., only Knoth and Parris remained on the deck with Masterson and the unidentified man.

{¶ 11} At one point, Parris was done drinking and went inside. Tension then developed between Knoth and Masterson. According to Knoth, he asked Masterson and his companion to leave. They refused and became aggressive, calling him "little bitch" and "faggot," and told him to "quit being a pussy." Knoth went inside the cabin to tell Parris about it. Knoth also claimed at one point Masterson was pounding on the door of the cabin, wanting to enter the cabin.

{¶ 12} Parris claimed that when he went outside to check on the situation after being told about Masterson being aggressive, Masterson approached him in a menacing manner saying "what's up" and, to diffuse the tension, Parris responded "chicken butt" jokingly. Masterson backed off, and Parris went inside the cabin.

{¶ 13} Parris and Knoth then went to wake up Brody, who was known to be a good fighter and trained in martial arts, to confront Masterson. According to Parris, he said to Brody "there's these two guys out here and they're not leaving. Can you help me get them to leave?"

{¶ 14} Plaintiff and the defendants disputed as to what occurred next. Plaintiff believed that when Brody came out of the cabin, he ambushed Masterson from behind with the help of Parris. While Parris distracted Masterson, Brody put

him in a chokehold, choked him to near unconsciousness, and then beat him viciously.

{¶ 15} Brody, on the other hand, claimed that his friends felt threatened and he tried to deescalate the situation. He successfully convinced the unidentified man to leave, but Masterson refused to leave. Brody claimed Masterson started the fighting by punching him in the head first. He put Masterson in a chokehold but he escaped the chokehold, and the two engaged in a mutual fight. Brody admitted that after the fight, he dragged Masterson, semiconscious at the time, by the ankle down the steps of the deck and placed him in the wood-line behind the cabin.

{¶ 16} Both Parris and Knoth claimed they were inside the cabin when the fighting took place on the deck, but both were apparently aware of the severity of Masterson's injuries — Knoth testified that after the fighting, Parris came inside the cabin and said, "I think Zach might have killed this guy."

{¶ 17} Parris, who had been cleaning up the cabin in preparation for their departure that morning, washed Masterson's blood off the deck. When he was cleaning up the yard area behind the deck, he could hear Masterson breathing in the wood-line. Parris admitted he found Masterson's wallet and gave it to Brody, who removed the identification from the wallet and threw it in a trash can.

{¶ 18} After Brody moved Masterson to the wood-line, he woke up Dustin McCullough, who was also staying in cabin 90, and took him to see Masterson. According to Brody, Masterson had moved himself 15 to 20 feet away from where Brody initially placed him and was still breathing. Brody asked him if he was okay,

and Masterson mumbled profanities at him. According to McCullough, Brody then kicked Masterson with his boot and Masterson groaned after being kicked. According to Brody, he checked on Masterson one last time before he left. Masterson was still alive and again mumbled profanities at him.

{¶ 19} It was disputed as to whether other members of the group staying in cabin 90 knew about the incident immediately, but everyone in that cabin left on the first ferry, leaving the island around 8 a.m. Knoth, who stayed at cabin 92 that weekend, went back to sleep for several hours before he left the island, later in the morning.

{¶ 20} Later that day, Knoth drove Brody from Brody's apartment in Bowling Green to the ferry to Put-in-Bay. Sarah Partlo, Brody's friend, met them there. Brady and Partlo took the ferry to the island. They rented a six-person golf cart and looked for Masterson behind the cabins. According to Brody, Masterson had moved again from where Brody last saw him.

{¶ 21} By the time Brody returned that evening, Masterson was deceased. To conceal Masterson's body, Brody grabbed a grill cover to cover it and moved it further into the woods behind cabin 94, where it was eventually discovered by Masterson's family, who looked for him all over the island the next day. For her involvement, Partlo later served six months in jail.

{¶ 22} According to Knoth, when he learned a body was found behind the cabins, he and Brotzki went to the police together. He denied any responsibility for Masterson's death, claiming he was inside cabin 90 when Brody assaulted

Masterson on the deck. He denied seeing Masterson lying in the wood-line and claimed he did not know Brody had dragged Masterson to the woods until after he left the island. In the statement Knoth gave to the police, Knoth stated Parris handed him a shirt to dispose of. When asked at trial if Parris gave him Masterson's bloody undershirt to dispose of, Knoth claimed Parris handed him something "wadded up" and he threw it in a trash can, but was not sure if it was a shirt.

{¶ 23} Parris also denied any responsibility, claiming he too stayed inside the cabin when Brody assaulted Masterson. He claimed he did not recall handing Masterson's bloody undershirt to Knoth but admitted that he cleaned Masterson's blood off the deck and gave Masterson's wallet to Brody. Plaintiff believed that Parris was on the deck when Brody attacked Masterson and helped distract Masterson to allow Brody to ambush Masterson. Plaintiff also maintained Parris was involved in helping Brody move Masterson further into the woods to keep him out of sight of those who were unaware of the incident.

{¶ 24} The next day (Tuesday), Brody, Parris, and Partlo met at Partlo's apartment to create a cover story for Masterson's death. They tried to reach Knoth, but unbeknownst to them, Knoth had gone to the Perrysburg police department to give a statement about the incident.

{¶ 25} When Masterson failed to return home on Monday, his family called the police and also drove to Put-in-Bay to look for him that night, but could not find him. The family, including Masterson's parents, returned to the island to search for him again the next day. They received a call from the Island Club in the afternoon

informing them a wallet missing an identification was found in the trash can around cabin 90. The family then went to search the area. Mark Masterson, the victim's brother, found a bloody undershirt in the backyard behind cabin 90. Soon after he spotted a foot sticking out from underneath a tarp. Masterson's mother passed out when Mark Masterson showed her the bloody shirt. When found by his family, Masterson did not have shoes or clothing on, except for his shorts, which were pulled down to the ankle.

{¶ 26} Masterson's injuries were severe. Both his death certificate and coroner's report were admitted as exhibits. The death certificate lists "blunt abdominal trauma" as the cause of death. The coroner's report indicates that Masterson's pancreas was lacerated, he had a substantial amount of blood in his abdomen, his left testicle was bruised, and his neck was badly bruised.

{¶ 27} Brody was subsequently charged with one count of involuntary manslaughter, a first-degree felony, and two counts of tampering with evidence, a third-degree felony. He entered a plea of guilty to these counts, and the trial court imposed maximum, consecutive sentences for a total of 16 years in prison. Brody appealed his sentence, and the Sixth District affirmed the trial court's judgment in *State v. Brody*, 6th Dist. Ottawa No. OT-12-022, 2013-Ohio-1708. Knoth was not

charged.   For his part, Parris was convicted of falsification, a first-degree misdemeanor.[2]

**The Wrongful Death Lawsuit**

**{¶ 28}** In 2016, Mark Masterson, Phil's brother, filed the instant wrongful death complaint as the administrator of Phil Masterson's estate, along with several family members including his parents, three brothers, and a sister, as well as Phil Masterson's fiancée Ayako Hobbs.  Before trial, the trial court granted motions filed by the defendants to dismiss the individual claims of the named plaintiffs, leaving the administrator of Phil Masterson's estate the only plaintiff at the time of trial.  In addition to Brody, Parris, Knoth, several other members of the fraternity group staying in cabin 90, Sarah Partlo, and several corporate entities related to the Island Club were also named as defendants.

---

[2] Parris entered a nonprosecution agreement with the state and provided information of events leading to the victim's death.  However, after his interview with law enforcement, the prosecutor decided he had not made a full and truthful disclosure, in breach of the agreement. Specifically, he allegedly omitted information about finding Masterson's wallet, the existence of Masterson's blood on the deck, picking up Masterson's undershirt and giving it to Knoth to dispose of, and the fact that Brody and his friend Sarah Partlo went back to the island to further cover up the crime scene.  After Brody was convicted of involuntary manslaughter following a guilty plea, Parris was charged with three counts of tampering with evidence and three counts of obstructing justice, one count of failure to report a death, and one count of falsification (regarding his interview with the police.) The trial court found the state did not prove Parris substantially breached the agreement because he provided sufficient information to prosecute Brody and dismissed all counts except for falsification, a first-degree misdemeanor, for which he received probation. The dismissal was affirmed by the Sixth District on appeal.  *State v. Parris*, 6th Dist. Ottawa No. OT-14-015, 2014-Ohio-4863.

{¶ 29} The complaint, which was not clearly drafted, set forth eight causes of action against the corporate and individual defendants. Four of the counts were alleged against the individual defendants. Count 1 alleged a common law negligence claim. Count 4 alleged all the individual defendants were involved in assaulting Masterson and none of them took any action to provide assistance to a disabled person to prevent further harm. Count 5 alleged all the individual defendants knew Brody was prone to violence and breached a duty to Masterson by failing to protect him from Brody. Count 7 alleged the defendants knew Masterson was near death but failed to seek assistance for him and thereby breached the duty imposed in R.C. 2305.45, which obligates a person "who finds a disabled person" to "make a reasonable effort to notify a law enforcement officer or medical practitioner."[3]

{¶ 30} As to damages, the complaint sought wrongful death damages and damages for Masterson's pain and suffering prior to his death. Plaintiff requested compensatory and punitive damages.

{¶ 31} The trial court subsequently dismissed the intentional tort claim against the codefendants except Brody. Ultimately, the claims tried and considered by the jury were a battery claim against Brody, negligence claims against Brody,

---

[3] Count 6 alleged Masterson's fiancée Hobbs suffered loss of consortium, and it was dismissed by the trial court because Hobbs is not a statutory beneficiary for a wrongful death claim. The remaining counts were alleged against the corporate defendants, which are the subject of Appeal No. 111035.

Knoth, and Parris, and a claim predicated on R.C. 2305.45 against Brody, Knoth, and Parris.[4]

**Jury's Award of Compensatory and Punitive Damages and the Trial Court's Reduction of the Jury Award**

{¶ 32} The jury returned verdicts in favor of plaintiff estate against the three defendants. In its answers to the interrogatories, the jury found that (1) Brody committed battery and Brody, Knoth, and Parris were negligent and also violated R.C. 2305.45; (2) Masterson did not assume the risk of harm, nor was he comparatively negligent; and (3) each defendant's conduct was a proximate cause of damages. Furthermore, the jury assigned the percentage of tortious conduct attributable to each party as Brody 60%, Knoth 10%, and Parris 30%.

{¶ 33} The compensatory damages in this case include damages on the survivorship claim for the deceased's conscious pain and suffering and damages on the statutory wrongful death claim. Regarding the survivorship claim for Masterson's conscious pain and suffering, the jury assessed $3 million dollars. Regarding the wrongful death claim, the jury awarded over $11 million dollars: (1) $1.1 million dollars for loss of support from the decedent's reasonably expected earning capacity; (2) $3,357,000 for the loss of the decedent's society, including loss of companionship, consortium, care, assistance, attention, protection, advice,

---

[4] The codefendants included Brian Cultice, Dustin McCullough, and Matt Brotzki. Before trial, the court granted Brian Cultice's motion for summary judgment, and Dustin McCullough and Sarah Partlo settled with plaintiff. Matt Brotzki was granted a directed verdict after trial.

guidance, counsel, instruction, training and education; and (3) $6.4 million dollars for mental anguish.

{¶ 34} After the jury returned the compensatory verdicts, the trial proceeded to the punitive-damages phase. The trial court instructed the jury on the elements of punitive damages. The parties made closing arguments without presenting new evidence. After deliberation, the jury assessed punitive damages of $10 million dollars: $6 million dollars against Brody, $3 million dollars against Parris, and $1 million against Knoth, in accordance with the fault apportionment among the defendants.

{¶ 35} The trial court subsequently reduced the award of $3 million dollars for the survivorship claim to $250,000, pursuant to the damages cap set forth in R.C. 2315.18(B)(2). Knoth filed a postjudgment motion to reduce the punitive damages based on lack of net worth, and the trial court reduced his punitive damages to zero pursuant to R.C. 2315.21(B)(2)(b).[5]

{¶ 36} Brody and Knoth separately appealed from the judgment. Knoth raises three assignments of error for our review. Plaintiff estate raises a single error in its cross-appeal. We address them in turn.

---

[5] Neither Brody nor Parris filed a similar postjudgment motion to reduce the punitive damages.

**Common Law Negligence**

{¶ 37} Under the first assignment of error, Knoth argues the trial court erred in denying his motions for directed verdict and for judgment notwithstanding the verdict regarding the negligence claim against him.

{¶ 38} Civ.R. 50(A) governs a motion for a directed verdict, which may be made at the close of the opponent's evidence or at the close of all the evidence. Civ.R. 50(B) governs a request for judgment notwithstanding the verdict ("JNOV").

{¶ 39} A motion for directed verdict under Civ.R. 50(A) tests the sufficiency of the evidence rather than the weight of the evidence or the credibility of witnesses. *Wagner v. Roche Laboratories*, 77 Ohio St.3d 116, 119, 671 N.E.2d 252 (1996). Pursuant to Civ.R. 50(A)(4), a motion for directed verdict shall be granted when "the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party * * *." However, where there is "'substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions,'" directed verdict should be denied. *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 679, 693 N.E.2d 271 (1998).

{¶ 40} In evaluating a Civ.R. 50(B) motion for JNOV, we apply the same test as in a motion for a directed verdict. *Kanjuka v. MetroHealth Med. Ctr.*, 151 Ohio App.3d 183, 2002-Ohio-6803, 783 N.E.2d 920, ¶ 14 (8th Dist.), citing *Grau v.*

*Kleinschmidt*, 31 Ohio St.3d 84, 90, 509 N.E.2d 399 (1987); *Posin v. ABC Motor Court Hotel*, 45 Ohio St.2d 271, 275, 344 N.E.2d 334 (1976) (the evidence "must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied"). The trial court considers neither the weight of the evidence nor the credibility of the witnesses in ruling on either a motion for a directed verdict or a JNOV. *Id.*

{¶ 41} We review de novo a trial court's granting or denial of a motion for directed verdict or JNOV. *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 14 (directed verdict), and *Osler v. Lorain*, 28 Ohio St.3d 345, 347, 504 N.E.2d 19 (1986) (JNOV).

{¶ 42} Regarding plaintiff's negligence claim, the complaint alleged Knoth (and the codefendants) "failed to exercise ordinary care to avoid causing severe injury and eventual death" of Masterson and failed to take actions to remedy a danger and to provide assistance or prevent further harm to Masterson.

{¶ 43} In a negligence claim, a plaintiff must establish that the defendant owed a duty to the plaintiff, the defendant breached that duty, and the defendant's breach of duty proximately caused the plaintiff's injury. *See, e.g.*, *Lang v. Holly Hill Motel, Inc.*, 122 Ohio St.3d 120, 2009-Ohio-2495, 909 N.E.2d 120, ¶ 10.

{¶ 44} The first assignment of error concerns the question of whether Knoth owed a duty regarding plaintiff's claim of ordinary negligence, the primary issue in this appeal. "Whether a duty exists is a question of law for the court to determine."

*Mussivand v. David*, 45 Ohio St.3d 314, 318, 544 N.E.2d 265 (1989).  As such, we review the question de novo. *Cameron v. Univ. of Toledo*, 2018-Ohio-979, 98 N.E.3d 305, ¶ 52 (10th Dist.).

{¶ 45} Knoth maintains that he was merely a bystander in the events resulting in Masterson's death and did not owe a duty to him to control the conduct of a third party (Brody), or to provide aid or to protect Masterson after Brody assaulted Masterson and dragged him to the woods.

{¶ 46} The testimony at trial reflects that, after Knoth felt threatened and harassed by Masterson, he and Parris woke up Brody, whom they knew to be a good fighter and trained in martial arts, to confront Masterson.  Furthermore, once aware of the gravity of the injuries sustained by Masterson, Knoth (and Parris) took no actions to mitigate Masterson's injuries.  The issue for us to resolve under the first assignment of error is whether Knoth owed a duty of care to Masterson under these circumstances.

{¶ 47} In support of his claim that he owed no duty toward Masterson, Knoth cites sections of the Restatement for the rule that a special relationship is required for a duty to exist.  He argues that, absent a special relationship between him and Brody (the third party), or between him and Masterson (the injured party), no duty existed on his part to control Brody's conduct or to come to Masterson's aid after Brody assaulted him.

{¶ 48} "Ordinarily, there is no duty to control the conduct of a third person by preventing him or her from causing harm to another, except in cases where there

exists a special relationship between the actor and the third person which gives rise to a duty to control, or between the actor and another which gives the other the right to protection." *Fed. Steel & Wire Corp. v. Ruhlin Constr. Co.*, 45 Ohio St.3d 171, 173 543 N.E.2d 769 (1989), citing *Gelbman v. Second Natl. Bank*, 9 Ohio St.3d 77, 458 N.E.2d 1262 (1984) (addressing the issue of the duty of a business to protect third parties and adopted Restatement of the Law 2d, Torts (1965) 122, Section 315). *See also, e.g.*, *Estate of Tokes v. Dept. of Rehab. & Correction*, Ct. of Cl. No. 2018-00846JD, 2018-Ohio-4149, ¶ 21; *Desir v. Mallett*, 10th Dist. Franklin No. 14AP-766, 2015-Ohio-2124, ¶ 22; and *Rice v. Kanoza*, 1st Dist. Hamilton No. C-110595, 2012-Ohio-2581, ¶ 12.

{¶ 49} As this court explained in *Godwin v. Facebook, Inc.*, 2020-Ohio-4834, 160 N.E.3d 372, ¶ 24 (8th Dist.),

> [u]nder the traditional Restatement analysis, there are five recognized "special relations" that justify imposition of liability for nonfeasance. A parent owes a duty to control the conduct of his or her child (Section 316); a master owes a duty to control the conduct of his or her servant (Section 317); the possessor of land or chattels owes a duty to control the conduct of a licensee (Section 318); an actor in charge of a person with dangerous propensities owes a duty to control such a person (Section 319); and an actor having legal custody of another owes a duty to control the other's conduct (Section 320). Restatement of the Law 2d, Torts 122, Sections 316-320. "In the absence of a special relationship sufficient to trigger one of these exceptions, a private party is not liable for failing, either intentionally or inadvertently, to exercise control over the actions of a third party so as to protect others from harm." *McCloskey v. Mueller*, 446 F.3d 262, 268 (1st Cir.2006).[6]

---

[6] *See also Estates of Morgan v. Fairfield Family Counseling Ctr.*, 77 Ohio St.3d 284, 293, 673 N.E.2d 1311 (1997), fn. 2 (noting that a classic example of a lack of duty in the absence

{¶ 50} While, as the trial court determined and we agree, there was no special relationship as defined in the common law (between Knoth and Brody or between Knoth and Masterson) giving rise to a duty on Knoth to aid Masterson, the special-relationship rule does not end the duty analysis under the unique circumstances present in this case.

{¶ 51} "[A]ctors engaging in conduct that creates a risk to others have a duty to exercise reasonable care to avoid causing physical harm.'" *Parker v. L.T.*, 1st Dist. Hamilton No. C-160642, 2017-Ohio-7674, ¶ 20, quoting Restatement of the Law 3d, Torts, Section 7 (2010). Furthermore, the Supreme Court of Ohio has often stated that "the existence of a duty depends upon the foreseeability of harm: if a reasonably prudent person would have anticipated that an injury was likely to result from a particular act, the court could find that the duty element of negligence is satisfied." *Wallace v. Ohio DOC*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, ¶ 23, citing *Texler*, 81 Ohio St.3d at 680, 693 N.E.2d 271; *Commerce & Industry*, 45 Ohio St.3d at 98, 543 N.E.2d 1188; and *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984). "The concept of foreseeability is an important part of all negligence claims, because '[t]he existence of a duty depends on the foreseeability of the injury.'" *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142

---

of a special relationship is that an expert swimmer who has a boat and rope at his disposal is under no duty to save a drowning man).

Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 24, quoting *Menifee* at 77. In analyzing the issue of duty in this case, we are aware, however, that "[f]oreseeability alone does not create a duty; instead, it is one of a number of factors that must be considered." *Santana v. Rainbow Cleaners, Inc.*, 969 A.2d 653, 666 (R.I.2009), citing *Ferreira v. Strack*, 636 A.2d 682, 688 n. 4 (R.I.1994); *Estates of Morgan v. Fairfield Family Counseling Ctr.*, 77 Ohio St.3d 284, 293, 673 N.E.2d 1311 ("foreseeability alone is not always sufficient to establish the existence of a duty").

{¶ 52} Central to our analysis of duty in this case is the notion that "the duty element of negligence may be established by common law, by legislative enactment, *or by the particular circumstances of a given case.*" (Emphasis added.) *Wallace* at ¶ 23, citing *Chambers v. St. Mary's School*, 82 Ohio St.3d 563, 565, 697 N.E.2d 198 (1998), and *Eisenhuth v. Moneyhon*, 161 Ohio St. 367, 119 N.E.2d 440 (1954), paragraph one of the syllabus.

{¶ 53} In addition, the Supreme Court of Ohio has recognized that "the concept of duty in negligence law is at times an elusive one." *Wallace* at ¶ 23.

> "There is no formula for ascertaining whether a duty exists. Duty '* * * is the court's "expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." (Prosser, Law of Torts (4th ed.1971) pp. 325-326.) Any number of considerations may justify the imposition of duty in particular circumstances, including the guidance of history, our continually refined concepts of morals and justice, the convenience of

the rule, and social judgment as to where the loss should fall. (Prosser, Palsgraf Revisited (1953), 52 Mich.L.Rev. 1, 15).'"

(Emphasis added.) *Id.* at ¶ 24, quoting *Mussivand*, 45 Ohio St.3d at 318, 544 N.E.2d 265, quoting *Weirum v. RKO Gen., Inc.* 15 Cal.3d 40, 46, 123 Cal.Rptr. 468, 539 P.2d 36 (1975).

{¶ 54} Here, the trial testimony reflects Knoth (and codefendant Parris) set in motion the events that ultimately resulted in Masterson's death. Masterson was invited by Knoth to stay and drink with those staying in cabin 90. Knoth was agitated when Masterson's behavior turned menacing when he was told to leave. He and Parris went to wake up Brody, whom they knew to be a good fighter and trained in martial arts, to confront Masterson. It was foreseeable that Masterson may suffer physical injuries at the hand of Brody. More importantly, after Masterson sustained injuries — both Knoth and Parris were aware of the severity of the injuries — it was foreseeable that Masterson may die from his injuries without medical attention. While foreseeability alone is not always sufficient to establish the existence of a duty, here, however, Knoth set in motion Brody's assault on Masterson and exposed Masterson to a high risk of harm; the foreseeability of the harm obligated Knoth to exercise reasonable care toward Masterson.

{¶ 55} While there is no duty to control a third party's criminal act and while a special relationship is generally required to create a duty, under the case law authority and the particular circumstances of this case, Knoth had a duty to exercise reasonable care toward Masterson and mitigate his injuries, such as seeking medical

attention for him, once he was aware of the gravity of Masterson's injuries. Accordingly, the trial court properly denied his motion for directed verdict and JNOV. The first assignment of error is without merit.

**R.C. 2305.45 Cause of Action**

{¶ 56} In addition to the common law negligence claim, plaintiff's complaint alleges that Knoth (and his codefendants) also breached a duty imposed by R.C. 2305.45. R.C. 2305.45 ("Search by unauthorized person") states, in its entirety:

> (A) A person, other than a law enforcement officer, medical practitioner, or a trained paramedic, who finds a disabled person shall make a reasonable effort to notify a law enforcement officer or medical practitioner. If a law enforcement officer or medical practitioner is not present, a person who finds a disabled person may:
>
> (1) Make a reasonable search for an identifying device;
>
> (2) If the identifying device is found, make a reasonable search for an identification card.
>
> If a device or card is located, the person making the search shall attempt promptly to bring its contents to the attention of a law enforcement officer or medical practitioner.
>
> (B) A cause of action does not arise from a reasonable search to locate an identifying device or identification card as authorized by division (A) of this section.

{¶ 57} The trial court found a duty existed under the statute, and the statutory claim was submitted to the jury as an alternative theory of liability. The interrogatories answered by the jury indicate that the jury found Brody, Knoth, and Parris negligent and violated the statute as well. Under the second assignment of error, Knoth argues the trial court should have granted his motions for summary

judgment, directed verdict, and JNOV with respect to plaintiff's claim under R.C. 2305.45. He maintains that the statute does not impose a duty of care and its violation does not give rise to liability. He also argues he did not "find" Masterson in a disabled condition and that his alleged failure to call 911 was not a proximate cause of Masterson's death.

{¶ 58} This assignment of error is moot in light of our determination that Knoth owed a duty towards Masterson under common law negligence. However, in the following, we note in dicta the inapplicability of the statute to the facts presented in this case.[7]

{¶ 59} In determining the statute's import, we are mindful that the statute should be considered in context and that statutes governing the same subject must be read in pari materia. *In re Z.R.*, 144 Ohio St.3d 380, 2015-Ohio-3306, 44 N.E.3d 239, ¶ 19. The title to Chapter 2305 is "Jurisdiction, Limitation of Actions, Architects, Engineers." R.C. 2305.45 is part of the Uniform Duties to Disabled Persons Act (R.C. 2305.41 to 2305.49).

{¶ 60} R.C. 2305.42 ("Disabled Person to wear identifying device") "authorizes" and "encourages" a "disabled person" to wear an identifying device containing medical information; it also states that by wearing an identifying device a person gives consent for any law enforcement officer or medical practitioner to

---

[7] Our research reveals that, since its enactment in 1976, over 46 years ago, the statute has never been reviewed by any court and there are no case law precedents interpreting the statute.

search his or her clothing for an identification card. R.C. 2305.43 ("Law enforcement officer's duties to disabled person") sets forth the duties of a law enforcement officer: for example, a law enforcement officer may make a reasonable search for an identifying device or identification card, and, if no identification device or card is found, the officer still has a duty to make a diligent effort to ascertain any illness causing the disabled condition; also, once determining a disabled person is suffering from an illness, the officer shall promptly notify the person's physician or transport the disabled person to a medical practitioner. R.C. 2305.44 ("Duty of medical practitioner") sets forth the duty of a medical practitioner: the practitioner is to make a reasonable search for an identifying device or an identification card and examine them for emergency information.

{¶ 61} The next statutory section, R.C. 2305.45 ("Search by unauthorized person") — the subject statute — requires an "unauthorized person," i.e., a person other than a law enforcement officer, medical practitioner, or a paramedic, who finds a disabled person to make a reasonable effort to notify a law enforcement officer or a medical practitioner and, if an officer or medical practitioner is not present, the "unauthorized person" is permitted to make a reasonable search for an identifying device or an identification card, and furthermore, if such a device or card is found, the person shall bring it to the attention of an officer or a medical practitioner. The following statutory section, R.C. 2305.46, prohibits the possession of false identifying device or identification card.

**{¶ 62}** R.C. 2305.45, read in context and in *pari materia* with the related statutes, does not appear to apply to the circumstances of this case. These statutory sections concern medical identification devices and sets forth the duty and rights of law enforcement and medical professionals regarding the identifying device. The statute requires an "unauthorized person" who finds a disabled person to first make a reasonable effort to notify law enforcement or medical professionals and, if none are present, the "unauthorized person" may then search for an identifying device.

**{¶ 63}** R.C. 2305.45, when read in context, does not appear to provide a basis for liability on Knoth under the circumstances of this case. While we find merit to Knoth's second assignment of error, the lack of duty under the statute does not alter the outcome of this appeal. As we have determined, Knoth owed Masterson a duty of care under common law negligence principles; the trial court properly instructed the jury on negligence; and the interrogatories indicate the jury found Knoth to be negligent.[8]

**{¶ 64}** Knoth's third assignment of error relates to the punitive damages assessed against him. Knoth claims he was prejudiced by certain procedural irregularities, specifically, the interrogatory regarding the apportionment of fault among the defendants was not given to the jury until it was deliberating the punitive

---

[8] We also note that our review of the interrogatories indicates that the jury was provided two alternative grounds for finding liability (negligence and/or a violation of R.C. 2305.45), and the jury was not asked to separately award damages for each cause of action.

damages. Knoth argues he was prejudiced by not knowing the fault apportionment when making closing argument on punitive damages. However, the trial court ultimately reduced the punitive damages award against him to zero based on his lack of net worth. As we explain in the following (under plaintiff's sole assignment of error in its cross-appeal), the trial court's reduction of the punitive damages against Knoth to zero was authorized by R.C. 2315.21. As such, Knoth's third assignment of error is moot.

**Plaintiff's Cross-Appeal**

{¶ 65} Plaintiff's sole cross-assignment of error on its cross-appeal relates to the trial court's reduction of the damages the jury assessed against Knoth.

{¶ 66} In a subsequent postjudgment motion to reduce damages, Knoth submitted an affidavit and attached financial documentation as exhibits to show that his net worth was zero at the time of his tortious conduct. He argued that, pursuant to R.C. 2315.21(D)(2)(b), the punitive damages awarded against him should be reduced to zero. Knoth also argued that, pursuant to R.C. 2315.18(B)(2), the wrongful death damages awarded to plaintiff should be further reduced by the amount of settlements between plaintiff and three codefendants: Sarah Partlo, Dustin McCullough, and Michael Masterson (a codefendant who was one of the individuals staying at cabin 90 and no relation to Philip Masterson).

{¶ 67} The trial court reduced Knoth's punitive damages to zero. It also determined that the compensatory damages awarded in favor of plaintiff should be reduced by the total settlement amount of $230,000. Accordingly, the trial court

entered an order that Knoth is liable for $1,087,700, which represents 10% of the total compensatory damages of $10,877,000 awarded to plaintiff. In its cross-appeal, plaintiff raises one cross-assignment of error challenging the trial court's reduction.

**Entitlement to Setoff Under R.C. 2307.28**

{¶ 68} Under the cross-assignment of error, plaintiff argues the trial court erred in reducing the compensatory damages based on its settlement with certain codefendants. When reviewing entitlement to a setoff, courts have applied an abuse of discretion standard. *Schalmo Constr., Inc. v. A. Bonamase Contracting*, 5th Dist. Stark No. 2009-CA-00037, 2009-Ohio-4953, ¶ 8, 12.

{¶ 69} Pursuant to R.C. 2307.28(A), when a release is given for a wrongful death claim, the release "reduced the claim against the other tortfeasors to the extent of the greater of any amount stipulated by the release or the covenant or the amount of the consideration paid for it * * *."

{¶ 70} In his motion to reduce the jury verdicts, Knoth submitted the releases with Partlo and Michael Masterson as proof that plaintiff reached a settlement agreement with Michael Masterson for $100,000 and a settlement agreement with Sarah Partlo for $30,000. Regarding McCullough, Knoth alleged he was unable to obtain a copy of the settlement agreement between plaintiff and McCullough and, instead, attached plaintiff's application to the probate court for approval of McCullough's settlement for $100,000. Plaintiff opposed the setoff,

arguing the settling codefendants did not admit liability in their settlement agreements and therefore Knoth was not entitled to any reduction.

{¶ 71} The trial court found the documents submitted demonstrated plaintiff's pretrial settlement of $30,000 with Partlo and $100,000 with Michael Masterson, and it specifically found that the McCullough settlement was documented by the estate's March 19, 2019 application to the probate court for an approval of $100,000 in Cuyahoga P.C. No. 2012 EST 182008. Regarding plaintiff's argument that the codefendants did not admit liability, the trial court determined that the reduction provided by R.C. 2307.28 is not contingent upon admission or finding of liability because there is no provision in the statute permitting reduction only in cases where the settling defendants have admitted liability.

{¶ 72} On cross-appeal, plaintiff raises a different argument as to why the trial court erred. It now argues that the trial court erred in ordering the setoff because Knoth failed to provide a settlement agreement between plaintiff and McCullough. A basic tenant of appellate jurisdiction is that a party may not present an argument on appeal that was not raised below. *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 679 N.E.2d 1099 (1997). Plaintiff did not challenge the evidence regarding the settlement with McCullough in the trial court, and we will not review an argument raised for the first time on appeal.

**R.C. 2315.21: Reduction of Punitive Damages Based on Net Worth**

{¶ 73} Under the cross-assignment of error, plaintiff also argues the trial court erred in reducing Knoth's punitive damages to zero. This court applies an

abuse-of-discretion standard when reviewing statutory punitive damages reductions. *Moore v. Schill*, 2019-Ohio-349, 129 N.E.3d 1013, ¶ 23 (8th Dist.).

{¶ 74} Knoth, citing R.C. 2315.21(D)(2)(b), argued that the amount of punitive damages assessed against him should be reduced to zero because he had no assets at the time the tort was committed. The trial court agreed.

{¶ 75} When the defendant is a small employer or an individual R.C. 2315.21(D)(2)(b) limits the award of punitive damages as follows:

> If the defendant is a small employer or individual, the court shall not enter judgment for punitive or exemplary damages in excess of the lesser of two times the amount of the compensatory damages awarded to the plaintiff from the defendant or ten per cent of the employer's or individual's net worth when the tort was committed up to a maximum of three hundred fifty thousand dollars, as determined pursuant to division [(B)(2)] of this section.

{¶ 76} "The party seeking reduction to avoid punitive damages bears the burden of showing that his financial situation was a pertinent factor in a lesser punitive damages award, and accordingly, is responsible for placing such evidence in the record." *Moore* at ¶ 18.

{¶ 77} After trial, Knoth filed a motion to reduce the award of punitive damages entered against him. Knoth attached to the motion his affidavit regarding his financial situation in September 2011. At the time he worked part time at UPS as a package handler loading semitrailers. He explained he did not have a W-2 statement for his wages for 2011, but attached to his affidavit a W-2 statement for 2012. The 2012 W-2 statement indicated a before-tax income of $14,280 and after-tax income of $11,794. Based on the 2012 W-2 statement, Knoth estimated his

income for 2011 to be $14,000.[9]  He also stated that he lived paycheck to paycheck and received financial assistance from his parents at the time.  Knoth in addition submitted documents to show he had a student loan balance of more than $30,000.

{¶ 78} Plaintiff filed a brief in opposition to Knoth's motion to reduce the punitive damages.  Notably, plaintiff did not request a hearing on the matter. Plaintiff argued that the reduction was not warranted on the ground that Knoth's affidavit was self-serving and the W-2 statement showed his income of 2012, not 2011. The trial court found evidence presented by Knoth credible and reduced the punitive damages awarded against him to zero.

{¶ 79} When a defendant establishes his net worth at the time the tort is committed is zero, R.C. 2315.21(D)(2)(b) requires the trial court to reduce the punitive damages to zero. On cross-appeal, plaintiff argues that Knoth failed to meet the burden of proof because Knoth's affidavit was self-serving and the 2012 W-2 pertained to his 2012 income instead of 2011 income.

{¶ 80}  Plaintiff did not ask for a hearing in which the trial court could hear testimony of witnesses and assess the credibility of Knoth's evidence regarding his net worth in 2011.  By submitting a brief in support of its opposition, plaintiff

---

[9] Specifically, Knoth averred that his records for the UPS employment only went as far as 2012.  He had requested his W-2 statement for 2011 from UPS but had yet to receive it. Knoth, however, remembered he worked the same hours per week in 2011 and was paid at a slightly lower rate in 2011.

essentially asked the trial court to make a credibility determination of the submitted affidavit and attached exhibits.

{¶ 81} The trial court is in the best position to assess the credibility of an affidavit, and we will not disturb its finding absent an abuse of discretion. *Hildebrand v. Hildebrand*, 8th Dist. Cuyahoga No. 96436, 2011-Ohio-5845, ¶ 19. *See also Starr v. Ohio DOC Div. of Real Estate & Professional Licensing*, 10th Dist. Franklin No. 20AP-47, 2021-Ohio-2243, ¶ 28 (finding no abuse of discretion in the common pleas court's assessment of appellant's affidavit). Here, the trial court found credible the evidence submitted by Knoth to demonstrate his lack of net worth and accordingly reduced the punitive damages to zero pursuant to R.C. 2315.21(D)(2)(b). The trial court acted within its discretion in assessing the credibility of the evidence. Plaintiff's claim regarding the reduction of punitive damages is without merit. Plaintiff's cross-assignment of error on cross-appeal is overruled.

{¶ 82} Having reviewed the record and applied pertinent statutory and case law authority, we find no merit to Knoth's appeal or plaintiff's cross-appeal. Accordingly we affirm the trial court's judgment.

{¶ 83} Judgment affirmed.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

SEAN C. GALLAGHER, A.J., and
KATHLEEN ANN KEOUGH, J., CONCUR